# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                )
MARK NAZARIAN,           )
         Plaintiff,      )
                )
vs.                )       **CIVIL ACTION**
                )       **NO. 12-11415-TSH**
                )
                )
ABBOTT LABORATORIES,    )
         Defendant.    )
_____)

## MEMORANDUM OF DECISION AND ORDER
### March 31, 2014

**HILLMAN, D. J.**

### Background

Mark Nazarian ("Plaintiff" or "Nazarian") filed a Complaint against Abbott Laboratories ("Abbott" or "Defendant") alleging federal claims for discrimination based on race and national origin (Count 1) and retaliation for his having filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD")(Count 2). Nazarian has also filed a state common law claim for wrongful termination (Count 3).

This Memorandum and Decision addresses Defendant Abbott Laboratories' Motion for Summary Judgment (Docket No. 32), and Defendant Abbott Laboratories' Motion To Strike Plaintiff's Evidence Offered In Opposition To Abbott's Motion For Summary Judgment (Docket No. 45). For the reasons set forth below, the motion to strike is allowed in part and denied in part, and the motion for summary judgment is allowed.

## Defendant's Motion To Strike

Abbott has moved to strike certain statements contained in the Plaintiff's affidavit on the grounds that such statements lack personal knowledge, are not factual and contradict his earlier deposition testimony, are argumentative and not grounded in fact and/or state legal conclusions. *See Affidavit of Mark Nazarian*, attached to *Pl's Reply To Rule 56.1 Statement* (Docket No. 38). I agree with Abbott that the following statements are not based on personal knowledge, but are premised on speculation and inference and, therefore, are stricken:

- It was clear that [Kevin Packard] did not know that I was from Syria prior to that conversation.

- Abbott was far more concerned with whether I could work independently and whether I was willing to work a different schedule.

- In fact, during the last few months of my employment on the Zymogentic project, Ms. Chudzik changed my weekly overnight schedule in order to prevent me from preparing for the assay and then she demanded that I run the assay even though I was not familiar with it in order to cause me to make mistakes. She then used those mistakes to support the termination of my employment.

- The claim that I was late to work makes no sense.

- With respect to the Performance Improvement Plan ("PIP") it should be noted that I disagree with the allegations about the manner in which I worked and how I treated others.

- In 2008, I achieved expectations in all of my work. In addition, I went above and beyond the call of duty . . . None of this was reflected in my 2008 Performance Assessment. In fact, I was more productive, more accurate, and volunteered for more projects than a colleague of mine who's overall Performance Assessment achieved expectations.

- Unfortunately, Jill Lebow made it clear to me that she had already prejudged my matter. She basically told me that I was not a good performer and that I was not well regarded.

- The matters raised in the Memorandum do not logically lead to the issuance of a CCP . . . of significant importance is that my performance compared favorably to my colleagues. I was more productive and more accurate than several colleagues who were not placed on CCPs and who were not terminated from their employment.

- After I received the CCP it was apparent that ER was not going to make any effort to address my concerns.

- Despite my qualifications and experience fitting the job description, I was denied the promotion.

- I realized that this was not true when Abbott allowed another employee from the second shift to receive the training that I had previously requested and that person was promoted.

- Mr. Packard frequently talked at me in an aggressive tone of voice . . . **in order to try to intimidate me.**

- It was painfully apparent that the exchange with Ms. Chudzik and the Final Warning were done in response to my complaint to Mr. Packard in which I advised him that I had gone to the MCAD.

- Mr. Packard was aware of the amended complaint and participated in preparing Abbott's response. I believe this to be true because Abbott's reply makes reference to statements made by Mr. Packard.

Abbott's request to strike the following statements on the ground that they are argumentative assertions not based on fact, is allowed:

- I am aware that Abbott claims that I did not treat my colleagues with respect. That is not true. I treated all colleagues and management with respect. It is not in my nature to disrespect someone.

- I performed more assays than my colleagues and had fewer errors than some of my colleagues. My percent of errors per assay was lower than my colleagues. I was not argumentative and did not disrespect colleagues or managers. I did not refuse to do work. In fact, there was no reason for me to do any of that.

- One of my colleagues made considerably more errors than me in 2008 . . . This employee also had more errors in 2007 but was not disciplined.

- Abbott changed its expectations for me on the 2008 performance assessment after completing a draft of the goals and expectations.

- I frequently performed as much as 100 more assays per year as compared to my colleagues at Abbott. While I had no problem with working hard I should not have been held to the same standards. For instance a person who makes 5 errors when performing 200 assays has a higher percentage of errors as compared to a person who makes 6 errors when performing 300 assays.

As asserted by Abbott, in response to a motion for summary judgment, Nazarian may not by way of affidavit assert facts which contradict testimony given at his deposition, although he may supplement or clarify such testimony. I find that the following two statements contradict his deposition testimony and therefore, are stricken:

- The Defendant did not provide a refresher training course to improve my performance on certain assays that I had not previously performed work on.

- I did not record assay data on sticky notes.

In all other respects, Abbott's motion to strike is denied.

## Defendant's Motion For Summary Judgment

### *Standard of Review*

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case." *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing,* 575 F.3d at 153. The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.,* at 152. "'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.'" *Id.*

(citation to quoted case omitted). "'[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." *Id.* (citation to quoted case omitted). The nonmoving party cannot rely on "conclusory allegations" or " improbable inferences". *Id.* (citation to quoted case omitted). " ' The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " *Id.* (citation to quoted case omitted).

## <u>Facts</u>[1]

### *Nazarian's Prior Employment*

Before going to work for Abbott, Nazarian (formerly known as "Nizar Nazar") had been employed as a quality control analytical chemist at Pharm-Eco, Laboratories, Inc. ("Pharm-Eco"), a pharmaceutical company. During his employment with Pharm-Eco, Nazarian was counseled regarding the frequency of his mistakes, his inability to efficiently multi-task, his tendency to waste time on minor duties and his failure to understand and comply with instructions. Nazarian's managers further noted that Nazarian's education and years of experience did not match his skill level and instructed Nazarian that it was unacceptable for him to blame his performance errors on inadequate training or instruction. Nazarian also had a tenuous relationship with female Chinese colleagues at Pharm-Eco. Nazarian believed that his Chinese colleagues, as a group, "stuck together" and were disrespectful.

---

[1] Nazarian submitted his own statement of undisputed facts. I agree with Abbott that many of the so-called "material facts" asserted by Nazarian were self-serving statements by the Plaintiff that were not based on personal knowledge, not supported by his citations to the record, were legal conclusions or argument (by which I mean contentious), and/or irrelevant. Additionally, for future reference, any sentence that contains wording to the effect that "a reasonable jury could infer," is not a statement of fact, it is legal argument.

As a result of his poor performance, Pharm-Eco terminated Nazarian's employment in 2002. Nazarian was sent a termination letter to this effect. [2] According to Nazarian, he was told by a manager at Pharm-Eco that when asked, he could report that his termination was due to "downsizing."

<u>*Nazarian's Employment With Abbott*</u>

Abbott is a global, broad-based health care company devoted to discovering new medicines, new technologies and new ways to manage health. At all relevant times, Abbott had policies in place, accessible on its internal website, that prohibited discrimination based on race and national origin, and retaliation. Abbott's Code of Business Conduct provides: "We are all expected to understand how this code applies to our own jobs and business decisions and activities—or if we don't understand, we must get help with our questions."

From 2003 to 2006, Kevin Packard ("Packard") held the position of Quality Control Senior Supervisor at Abbott. In 2006, Packard became Quality Control Manager and was responsible for managing the Quality Control Lab. From 2005 to 2010, Pamela Barney was the Manager of Business Human Resources and was responsible for business human resources and employee relations. From 2002 on, Robert O'Hagan held the position of Director of Quality Operations and oversaw the Quality Assurance and Quality Control Departments.

Nazarian worked, at-will, as a Quality Control Research Associate II ("QC Scientist") in Abbott's Global Pharmaceutical Operations Division from December 2, 2002 through August 4, 2009. Packard was Nazarian's hiring manager, and Packard was aware that Nazarian was of Syrian origin when he approved Nazarian's hire. However, Packard was not aware that Pharm-Eco had terminated Nazarian's employment for performance reasons; Nazarian had represented

---

[2] Clearly, Nazarian was terminated from Pharm-Eco for poor performance. His attempt to create a dispute about this fact is *at best* disingenuous.

to Packard that his reason for leaving Pharm-Eco was "downsizing." Had Packard been made aware of the real reason Nazarian left his previous job, Packard would not have hired him.

As a QC Scientist, Nazarian's job responsibilities included performing various quality control tests, or assays, to ensure that Abbott's pharmaceutical products met quality standards and could, therefore, be sold to the public. As a pharmaceutical company, Abbott and its employees are required to comply with many rules and regulations because Abbott operates in a heavily regulated industry. In particular, Nazarian was required to comply with Abbott's standard operating procedures ("SOPs") in performing his work as a QC Scientist.

Nazarian reported to Packard until 2005, and then from 2005 until 2009 Nazarian reported to Quality Supervisor, Davida Chudzik ("Chudzik"), who reported to Packard. Prior to 2005, Nazarian primarily performed quality control assays on the Abbott drug Humira, and two similar pharmaceutical products. In 2005, however, Humira production moved to another location and Nazarian became responsible for performing quality control assays on dozens of different pharmaceutical products. Given the change in responsibility, Nazarian's managers arranged for Nazarian to a undergo a refresher training course to improve his performance on certain assays that he had not previously performed on a regular basis.

Abbott uses performance assessments to measure performance. The assessments are typically issued on an annual basis. Some of the categories in the performance assessments are objective, while others are more subjective. For 2003, Nazarian received an overall rating of Achieved Expectations ("AE"), which included integrity, initiative, adaptability, and teamwork. He received the same assessment (AE) for 2004. On several occasions, he stayed late to help other employees.

While Nazarian received an overall rating of AE on his 2005 performance review, he received a rating of only Partially Achieved Expectations ("PA") in the areas of adaptability and timeliness—PA is the second lowest level of four possible ratings. Nazarian's 2005 performance review specifically noted that:

> Nizar had some difficulty adapting to changing situations in the lab this past year. He should check lab priorities with the manager or supervisor, rather than depend on his own judgment.
>
> [Nizar] has demonstrated difficulty with performing infrequently used but previously learned testing methods.
>
> While Nizar hands in his packages on time; reviewers have had to hand back his work for correction. This causes lost time for reviewers as the packages require a second review.
>
> Nizar needs to demonstrate that he can consistently produce accurate, thorough, and presentable work in all methods previously learned so that he may advance to new testing methods.
>
> The focus for Nizar in 2006 should be to complete documentation accurately the first time and yet maintain a reasonable turnaround from the time an assay is finished to handling in the completed package for review.

Nazarian refused to sign the 2005 performance review and subsequently lodged a complaint with Abbott's Employee Relations ("ER") department. ER Manager, Jill Lebow ("Lebow") conducted an investigation into Nazarian's concerns and told him that she found nothing unfair with the assessment.

In late 2005, Nazarian spoke with Chudzic and Packard about his concerns that he was being held back from advancement within the company. He specifically mentioned that there was training that he felt he should have received in order to grow as a valued Abbott employee, including training in "ELISA" and "Peptide Mapping." Nazarian was aware that satisfactory completion of the training was a prerequisite for advancement. Packard told Nazarian if he did not like it, he could find a job in some other company. Nazarian's 2005 performance assessment

was completed after he expressed his concerns to Chudzic and Packard. In his meeting with Lebow, he suggested that the negative criticism in his 2005 performance assessment was in response to his conversation with Chudzic and Packard about advancement.

Nazarian's difficulties in conducting assays continued in 2006. Nazarian's 2006 performance review reflected these concerns: he received an overall AE, but a PA concerning assays. The assessment contained negative criticism concerning integrity. The performance review noted that Nazarian had seven operator no-tests in 2006, a value higher than the norm. An operator related no-test results when a QC Scientist makes an error in conducting an assay, such as failure to follow an SOP. Nazarian attributes the number of no-tests to having to have learned a new assay and to a poorly written SOP. Chudzic and Packard refused to discuss the 2006 performance assessment with Nazarian. As with his earlier performance review, Nazarian refused to sign the evaluation. He complained to the ER department on May 23, 2007. Lebow informed Nazarian that she was about to go on vacation and would investigate his concerns when she returned, or he could call the ER hotline for immediate assistance.

To assist Nazarian improve his performance, ER recommended placing Nazarian on a Coaching and Counseling Plan ("CCP"), which was delivered to Nazarian on June 19, 2007. The CCP memorialized his management's concerns with Nazarian's performance issues from March 2007 through May 2007, including what they perceived as Nazarian's disregard of instructions, use of non-training equipment while performing assay training, late arrival to work without prior authorization, recording of assay data on a sticky-note, initiation of an unauthorized assay run, and failure to properly prioritize work. The CCP also outlined Abbott's expectations for Nazarian and specifically instructed Nazarian to make better decisions, recognize assay acceptance criteria, attend re-testing procedures, prioritize work appropriately,

refrain from disrespectful behavior, accept accountability for his own actions, perform all testing with minimal errors and comply with all SOPs.   The CCP instructed Nazarian that "[u]ltimately, improving your performance is your responsibility and you remain accountable for your results . . . Immediate, consistent and sustained performance improvement is necessary or you may be subject to further disciplinary action."

Nazarian retained an attorney who wrote a letter to Abbott on June 27, 2007,  alleging that Nazarian was the victim of workplace discrimination.  Around mid-July, Lebow conducted an investigation of Nazarian's concerns and concluded that the performance issues referenced in the CCP were legitimate.  Lebow's notes do not reflect the nature of her investigation.

 Abbott concluded that Nazarian successfully completed the CCP in January 2008, but advised him that his level of performance had to be sustained and that failure to meet Abbott's performance expectations might result in further disciplinary action. Nazarian's 2007 performance review, delivered in March 2008, was rated AE, but it was noted that Nazarian needed to continue to focus on reducing his operator no-test rate and performing his assigned assays in accordance with manufacturing guidelines. Nazarian had volunteered for projects not assigned to him and his 2007 performance assessment reflected a rating of exceeds expectations for initiative.

According to Nazarian, the SOPs for new projects were poorly drafted.  For that reason, he suggested that Abbott revise the SOPs.  Nazarian did not have any lab errors after the SOPs were revised.  Nazarian came in late at time because there were nights when he worked late. Because he was a salaried employee he did not get overtime and therefore, Packard told him that it would be fair for him to come in late on occasion.

In 2008, Nazarian failed to sustain his performance improvement. In August 2008, Nazarian followed the wrong procedure in performing an assay, resulting in a nonconformity report and causing data to be invalidated. Nazarian was further counseled in August 2008 for failing to prioritize work according to his manager's instructions and failing to complete work assigned to him on time. Moreover, on his 2008 performance review, Nazarian received an overall PA as well as PAs in specific areas concerning assays, teamwork, integrity and adaptability. Nazarian's 2008 performance review stated:

> There were several instances that occurred when [Nizar] did not follow standard operating procedures.
>
> A great deal of guidance, assistance by management and time was required for relatively minor changes [to SOPs] to be completed.
>
> Nizar repeatedly performed inaccurate calculations within assays . . . an investigation was required because Nizar had incorrectly followed the wrong procedural sub document for A280s twice . . . He had higher than average rate of operator related no-tests.
>
> While strategies were set forth to help Nizar improve performance including several discussions held to provide specific feedback to enable change to happen, there was a failure to demonstrate immediate and sustained improvement. As a QC Analyst II, it is essential to achieve expectations in Abbott's core competencies.

This was the first performance review for which Nazarian's overall rating was below AE. Nazarian feels that the assessment did not take into account that he volunteered for projects not assigned to him, including rewriting twelve SOPs.

On March 17, 2009, Abbott placed Nazarian on a Performance Improvement Plan ("PIP"). The PIP highlighted Nazarian's performance deficiencies, including repeated instances of using incorrect documentation procedures. The PIP further outlined areas of improvement and expectations related to Nazarian's accuracy and use of appropriate SOPs. The PIP warned

that "[f]ailure to show immediate, consistent and sustained performance improvement will result in a review for termination of your employment."

Nazarian refused to sign the PIP and contacted Sharon Passaretti ("Passaretti"), Senior Specialist Employee Relations, regarding his PIP. Nazarian told Passaretti that he was "doing everything perfectly … on a daily basis without delay" and that the PIP was "black letter" and majority is "fabricated." Passaretti explained to Nazarian the significance of the PIP and reminded him that he could be subject to further disciplinary actions if he did not successfully complete the PIP. Passaretti also explained that Nazarian's management had been working with ER since 2006 to address Nazarian's ongoing performance issues and that the issues were well-documented. Passaretti advised Nazarian that he needed to take accountability for improving his performance.

In Nazarian's April 29 and June 4, 2009 PIP reviews, Packard and Chudzik noted that they believed that Nazarian continued to have difficulties following appropriate SOPs, cited several recent instances where they believed that Nazarian produced invalid testing and operator errors, and noted an incident where they believed that Nazarian refused to accept responsibility for an operator error. On July 2, 2009, Packard and Chudzik again reviewed the PIP and extended it until August 1, 2009. The July 2 review stated that Nazarian was failing to meet all of the PIP's expectations, had continued to fail to adhere to SOPs in June, causing a laboratory investigation and an operator no-test, and had failed to follow lab procedures by re-testing without prior approval. In late July 2009, Nazarian met with Packard to again review his performance under the PIP and discuss certain performance inadequacies. Several days later, on July 28, 2009, Chudzik and Packard delivered another written PIP review to Nazarian. The July 28 review documented several July errors Nazarian had made related to assay calculation, failure

to adhere to SOPs resulting in operator no-test and failure to follow lab procedures. The PIP review emphasized that "[t]hese issues pose a compliance risk for the Quality Control Department."

Nazarian also received numerous warnings during his employment with Abbott for failing to conduct himself in a professional manner. In late May 2007, Judith Dudley, a Quality Control Manager, reported to Nazarian's supervisors and Lebow that she had "had several difficult and uncomfortable interactions with Nizar" during which she believed that Nazarian was disrespectful and spoke in a condescending manner. Nazarian's CCP addressed this issue, noting Nazarian's disrespectful behavior towards management and staff and directing Nazarian to treat all staff members with respect.[3] In April 2008, Nazarian and Ying Tan, an Asian female QC Scientist working in his department, engaged in a loud verbal argument at work, which resulted in both Nazarian and Tan receiving written warnings for inappropriate workplace behavior. Nazarian's written warning noted that he had treated his coworker unprofessionally, as observed by two QC managers, and was defensive and agitated in responding to guidance from his superior. The warning also advised that "another incident of inappropriate behavior in the workplace will be subject to further disciplinary action up to and including a review for separation from Abbott."

Nazarian ignored the 2008 written warning. On September 10, 2008, Packard and Chudzik issued Nazarian a final written warning for inappropriate behavior following an August 26 discussion with his direct supervisor. The final written warning noted that Nazarian was argumentative, confrontational and refused to perform work assigned to him. Following the

---

[3] Nazarian's self-serving statement that he never acted inappropriately or disrespectfully towards management or colleagues has been stricken. Even I were to consider the statement, it would not create a genuine issue of material fact in light of the abundance of evidence to the contrary. For example, Abbott's statement of material facts accurately states Ms. Dudley's characterizations of her interactions with Nazarian. *See Nazarian Dep. Ex.* 13 (Docket No. 34, at p. 199).

August 26, 2008 incident, Nazarian also had a sit-down meeting with Chudzik and William Robert ("Robert"), Senior Control Manager, in which Robert directed Nazarian to follow Chudzik's orders.

Nazarian was further counseled on the importance of professional behavior in the March 17, 2009 PIP, which highlighted his previous written warnings. On March 17, 2009, he was placed on a 90 day PIP. The PIP does not reference any formal performance discussions after October 2008. PIPs are ideally issued quickly after management learns of deficiencies in an employee's performance. On May 22, 2009, while on the PIP, Nazarian again displayed argumentative behavior towards Chudzik. That behavior was documented in the June 4, 2009 PIP review, which noted that Nazarian failed to accept responsibility for an operator error, was argumentative and refused to write up the sample error unless the no-test was deemed to be a result of process error, rather than operator error. As a result, Chudzik ultimately wrote the no-test form instead of Nazarian.

Abbot used Growth Plans as a way to manage performance. Nazarian submitted his Growth Plan on May 6, 2009 and never received any response from Abbott. Abbott terminated Nazarian's employment on August 4, 2009. Packard recommended Nazarian's termination, but as he had moved on to a different position, Chudzik and Robert, with support from Abbott's ER and Human Resources departments, made the termination decision. Nazarian submitted an internal appeal of his termination, which was reviewed by O'Hagan and rejected.

*Evidence Relating to Discrimination Charges*

During a Quality Control Department meeting in 2007 attended by all of the employees in the department, images of flags representing the national origin of each employee in the department were put on the screen. A Syrian flag was not included; Syria is Nazarian's home

country. Packard laughed and "mocked" Nazarian in front of the other employees; he commented that Nazarian's flag was not there. It was the only flag reflecting employee's national origins that was missing. Abbott never apologized for the oversight. Nazarian applied for the Senior Stability Analyst position within Abbott in early July 2008. He was denied the position.

Packard cancelled Nazarian's December 2008 scheduled vacation; he was permitted to take an entire month of vacation in November. In early January 2008, after he returned from vacation, he went to see Packard in his office. Packard introduced Nazarian to someone in his office in a mocking tone "here is Nizar, the Syrian." Nazarian felt extremely uncomfortable.

Chudzik and Packard denied Nazarian training on ELISA, DNA, Carbos, and Peptide Mapping. The purported reason was that Nazarian did not need the training for his second shift and it would not be beneficial to the company. Another employee from the second shift received the training and was promoted. Additionally, Another employee had more than the acceptable number on "operator no tests" in 2008, but received an overall rating of AE; this person had less "operator-no-tests" than Nazarian. Some of the negative criticism which Nazarian received in his performance evaluations was in the subjective categories.

Packard frequently talked to Nazarian in aggressive tone of voice and often banged his fist on the desk or would thrust an elbow into the wall. Nazarian feels that Packard attempted to intimidate him. Packard did not always report to ER when an employee complained to him. He did not tell the employee what to do if he was unable to resolve the concern. Packard was not interviewed as part of an investigation concerning complaints by Nazarian. He is unaware whether ER or the human resources department ever investigated a complaint made by Nazarian

during the time he was Nazarian's supervisor. At most, he recalls a discussion of Nazarian's complaints.

Nazarian went to the MCAD on August 12, 2008 to learn of his rights to initiate the process of filing a complaint of discrimination. After Nazarian returned from the MCAD, he met with Packard and told him he had gone to the MCAD and would not pursue a complaint with the MCAD if he agreed to stop harassing him.[4] Several days later, Packard asked Nazarian to work on a very time sensitive project that was a priority. Shortly thereafter, Chudzik asked Nazarian to work on a project. Nazarian told Chudzik that he had to finish the assignment from Packard before starting her project. Chudzik became angry and voiced her displeasure. The final warning letter which Nazarian was given on September 10, 2008 appears to be based on the interaction between Nazarian and Chudzik. Chudzik took notes regarding Nazarian from October 2008 until his employment was terminated in August 2009. The notes from October 2008 through April 2009 were forwarded to the ER department. Chudzik had taken notes concerning Nazarian from as early as 2005.

On September 16, 2008, Nazarian filed his first complaint of discrimination with the MCAD. That complaint alleged that Nazarian was denied promotional opportunities and was issued a final written warning on account of his race and national origin. On April 4, 2009, Nazarian filed an amendment to his MCAD complaint. The amendment alleged retaliation on account of the September 2008 MCAD complaint and discrimination on the basis of age.

---

[4] Nazarian asserts that he returned from the MCAD and spoke with Packard and told him he had gone to the MCAD and would not pursue a complaint if he agreed to back off and stop harassing him. I agree with Abbott that although Packard recalls there was a conversation with Nazarian about the MCAD (although he is not sure it was directly with him), the timing of that conversation is in doubt. More specifically, Packard's deposition testimony cited by Nazarian does not support his contention that the conversation took place after his (Nazarian's) August 12, 2008 meeting with the MCAD. Nazarian contends he talked to Packard about not pursuing charges with the MCAD. However, Packard's testimony is that Nazarian talked about *dropping the charges* —suggesting that the conversation took place *after* Nazarian filed his charge with the MCAD, not after he went to the MCAD in August 2008. Nevertheless, because I agree with Abbott that the fact is immaterial, I will accept it as true.

Nazarian specifically alleged that as a result of his previous MCAD charge, Nazarian was denied vacation time, failed to receive training opportunities, received a poor evaluation on his 2008 performance review and was placed on the PIP. Abbott filed an amended charge with the MCAD on April 28, 2009. Packard prepared a review of the PIP the next day. Abbott caused subsequent documents relating to the PIP to be issued on June 4, 2009, July 2, 2009 and July 28, 2009.

The MCAD dismissed Nazarian's September 2008 complaint, as amended, on May 21, 2009. On August 5, 2010, the EEOC adopted the MCAD's findings and issued a right to sue letter that same day, warning that a lawsuit "must be filed WITHIN 90 DAYS of your receipt of this notice; or your right to sue based on this charge will be lost." Nazarian failed to file a lawsuit within 90 days of his receipt of the EEOC's August 5, 2010 right to sue letter.

Nazarian filed a second MCAD complaint on August 4, 2009. Nazarian's second MCAD complaint alleged only that he was wrongfully terminated in retaliation for his previous MCAD complaint and because of his national origin and age. The MCAD dismissed Nazarian's second complaint on August 25, 2011; the EEOC issued a right-to-sue notice at Nazarian's request on May 25, 2012. Nazarian filed the complaint in the current litigation on August 1, 2012.

## Discussion

### *Plaintiff's Claims for Violation of Federal and State Discrimination Laws*

#### ***Whether Nazarian's Claims Relating to The First Complaint He filed with the MCAD are Time-Barred***

Abbott argues that all of Nazarian's claims which are unrelated to his termination are time-barred because he failed to file suit within the 90 period after receiving a right to sue letter from the MCAD. *See* 42 U.S.C. §2000e-(5)(f)(1). More specifically, the MCAD issued Nazarian a right to sue letter regarding his first complaint on August 5, 2010. Nazarian did not

file this suit until August 1, 2012. Nazarian's response is somewhat vague and confusing. He does not argue that he can pursue any legal claims concerning matters which were raised in his first MCAD complaint. Instead, he argues that he can rely on matters raised in his first MCAD complaint to support his claims for discrimination and retaliation which he alleged in his second MCAD complaint. Nazarian's argument is misplaced and fails to respond to Abbott's contention that any discriminatory acts which Nazarian raised in his first MCAD complaint fall outside the statute of limitations and are therefore, barred.

I find that Nazarian cannot assert any legal claims based on allegations which he made in his first MCAD complaint. These claims include that he was not promoted, was denied training and was treated harshly by his supervisor. Therefore, Abbott is entitled to summary judgment with respect to any such claims. *See Loubriel v. Fondo del Seguro del Estado*, 694 F3d 139 (1st Cir. 2012)(Under Title VII, claimant receives right to sue notice upon exhausting his administrative remedies and failure to bring judicial action within 90 days of receipt of the letter serves as time bar; existence of continuing violation does not extend 90 day period).

### *Whether Summary Judgment Should Enter on Nazarian's Discrimination Claim*

Nazarian claims that Abbott discriminated against him based on his race and national origin, in violation of 42 U.S.C. §2000e *et seq.*("Title VII") and Mass. Gen. L. ch. 151B ("Chapter 151B"). Because Nazarian has not presented direct evidence of race or national origin discrimination, his claims are analyzed under the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). Under the *McDonnell Douglas* analysis, a plaintiff must first establish a prima facie case of discrimination by showing that: (1) he is a member of a protected class; (2) he was qualified for the job, *i.e.*, met his employer's expectations; (3) his employer took a materially adverse employment action against

him; and (4) either  someone with similar qualifications took over his responsibilities, or the employer searched for someone with similar qualifications to fill the position.  *See Parra v. Four Seasons Hotel*, 605 F.Supp.2d 314, 325-26 (D.Mass. 2009).  "Once this showing is made, the burden shifts to the employer to articulate a legitimate, non-discriminatory basis for the disputed employment action. If the employer supplies such an explanation, the burden shifts back to the plaintiff to demonstrate that the employer's proffered rationale is pretextual and permits the inference of a discriminatory purpose." *Id.*, at 326.

The plaintiff need not establish both pretext and discriminatory intent; instead, the jury can infer discriminatory intent where the plaintiff has made out a prima facie case and "has provided strong and 'sufficient evidence to find that the employer's asserted justification is false.'" *Id. (*quoting *Plumbing Products, Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097 (2000)). Furthermore,

> At the summary judgment stage, the First Circuit has held that courts can forgo the burden-shifting framework and look instead to whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus. Here, the court of appeals has cautioned against granting summary judgment for the employer when a plaintiff 'makes out a prima facie case and the issue becomes whether the employer's stated non-discriminatory reason is a pretext for discrimination.' Nonetheless, the First Circuit has also stated that 'summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'.

*Id.* (internal citations and citation to quoted case omitted). The same analysis applies to parallel claims brought under Chapter 151B. *Id.*

### Nazarian's Prima Facie Case[5]

There is no dispute that Nazarian is a member of a protected class and he suffered an adverse employment action. Since neither party addresses it, I will assume that Nazarian has satisfied the last prong, that is, that he was replaced by someone outside his protected class, or the position remained unfilled.  Abbott contends that Nazarian has not established his prima facie case, because he did not meet legitimate job expectations, *i.e.,* he was not qualified for his position.  Nazarian, on the other hand, argues that he was qualified for his position and that all of his job performance review were satisfactory until he field his first claim with the MCAD.

Although it is a close call, for purposes of this discussion, I will assume that Nazarian has established that he was qualified for his position and therefore, established a prima facie case.  I will analyze his work performance in the context of the next steps in the *McDonnell Douglas* sequential analysis—whether Abbott has established a legitimate non-discriminatory reason for his termination and if so, whether that reason was pretext. *Accord Parra*, 605 F.Supp.2d at 327 (whether plaintiff's job performance was unsatisfactory or employer's allegations are mere pretext is more properly addressed at subsequent steps of *McDonnell Douglas* analysis).

### Abbott's Legitimate Non-Discriminatory Rationale

Abbott asserts that it terminated Nazarian on August 4, 2009 for unsatisfactory work performance.  Following is a summary of the Court's findings regarding Nazarian's work performance issues. Based on these findings, I conclude that Abbott has proffered a legitimate non-discriminatory reason for terminating his employment.

---

[5] Nazarian rightfully does not argue that he has any direct evidence of discrimination based on race and/or national origin.  The only evidence that he has on this issue is that 1) Packard referred to him as a Syrian to someone in his office, and  2) Packard mocked him when the Syrian flag was not included in slide show of flags representing the national origin of employees present at a team meeting.  Both of these incidents occurred well before Nazarian was terminated and, although may have been in poor taste, do not on their face *necessarily* carry the negative connotation which Nazarian seeks to ascribe to them.

In 2003 and 2004, Nazarian performance reviews reflected that he achieved expectations. While it is true that in 2005, his overall rating was "AE," Nazarian received "PA" in the areas of adaptability and timeliness. More importantly, written comments contained in the evaluation noted that: 1) he had difficulty adapting to changes in the lab, 2) difficulty with using testing methods that he had previously trained on that were used infrequently, 3) he handed in "packages" on time, but which contained errors, necessitating a second review, 4) he needed to demonstrate an ability to consistently produce accurate, thorough and presentable work in all known testing methods so that he could advance to new methods, and 5) in the coming year, he needed to focus on completing documentation accurately the first time, while maintaining a reasonable turn around time.

Nazarian achieved an overall rating of "AE," in his 2006 performance evaluation. However, he received a "PA" concerning assays and negative criticism concerning integrity. Additionally, it was noted that he had seven operator no-tests in 2006, which was higher than the norm. After the 2006 evaluation (which was completed in 2007), Nazarian was given a CCP which memorialized his managers concerns with his performance from March 2007 through May 2007. The CCP noted that Nazarian disregarded instructions, used non-training equipment while performing assay training, arrived late to work without prior authorization, recorded assay data on sticky notes, initiated an unauthorized assay run, and failed to properly prioritize work. The CCP also outlined Abbott's expectations for Nazarian and instructed him on ways he could perform better. The CCP concluded with the following language, "[u]ltimately, improving your performance is your responsibility and you remain accountable for your results … Immediate, consistent and sustained improvement is necessary or you may be subject to further disciplinary action."

Nazarian did successfully complete the CCP in January 2008.  At that time, he was informed that his level of performance had to be sustained, or he could still be subject to further disciplinary action.   Nazarian's 2007 performance evaluation (delivered in March 2008) rated him as "AE."  It was noted that he needed to continue to focus on reducing his operator no-test rate and performing his assigned assays in accordance with applicable guidelines.  However, in August 2008, Nazarian followed the wrong procedure in performing an assay.  He was also counseled for failing to properly prioritize his work and for failing to complete work assigned to him on time.

Nazarian's rating in his 2008 performance evaluation was "PA."  He received a "PA" in the areas of assays, teamwork, integrity and adaptability.  Specific criticisms included: 1) there were several instances where he did not follow standard operating procedures; 2) a great deal of management guidance and assistance, was required, 3) he repeatedly performed inaccurate calculations within assay and he had a higher than average rate of operator no-tests, and 4) despite putting several strategies in place to assist him in improving his performance, Nazarian failed to demonstrate immediate and sustained improvement.

On March 17, 2009, Nazarian was placed on a PIP, which highlighted his deficiencies and outlined areas of improvement and expectation related to his accuracy and use of appropriate SOPs.  The PIP warned that failure to show improvement would result in a review for termination of his employment. Nazarian received negative PIP reviews in April, June and July 2009 in which it was noted that his work continued to suffer from many of the previously noted deficiencies, *i.e,* operator error, invalid testing and/or  failure to follow SOPs.  In addition to unsatisfactory performance reviews: in May 2007, a co-worker reported having negative interactions with Nazarian; in April 2008, he received a warning concerning his interaction with

a co-worker (they both received warnings); and he received a third warning following an incident with a direct supervisor in August 2008. Nazarian was terminated in August 2009.

Having found that Abbott has satisfied its burden of establishing a legitimate non-discriminatory reason for terminating Nazarian, under *McDonnell Douglas's* burden shifting framework, the burden now shifts to Nazarian to Abbott's explanation is pre-textual and that a jury could find that the real reason he was terminated was related to his race and/or national origin.

### Was Abbott's Reason For Terminating Abbott Pretextual

In order to meet his burden at this stage, Nazarian is not required to show both pretext and discriminatory intent. Instead, all Nazarian needs to survive summary judgment is that Abbott's purported reason for terminating him was false. Such showing, together with the inference raised by his prima facie case, may be enough for the jury to find that the employer had a discriminatory intent. At the same time, if the evidence in the record conclusively establishes that the employer's reason was non-discriminatory, "'or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred,'" then summary judgment in favor of the employer is warranted. *See Parra*, 605 F.Supp.2d at 328 (citation to quoted case omitted).

Nazarian's overriding argument is that throughout his employment, he received satisfactory work performance evaluations and that it was only after he started complaining that he was being discriminated against and harassed that he received criticism, warnings and poor performance evaluations. He also asserts that he has demonstrated that his performance was

strong and compared favorably to an unnamed co-worker(s) who was not terminated despite issues with his work performance.

It is clear from the forgoing summary, that Nazarian's work performance while initially rated satisfactory, continued to decline from 2005 onward. Significantly, he failed to improve his performance in the specific areas that were noted as deficient. Nazarian's assertion that his performance reviews were satisfactory until he filed a complaint with the MCAD ignores reality and underscores the shortcomings in his case. [6] Simply put, Nazarian may be the only person who is of the belief that in the last few *years* of his employment at Abbott his performance was satisfactory. On this record, I find that the evidence conclusively establishes that Abbott terminated Nazarian for poor work performance and that he has failed to meet his burden of establishing pretext. [7] Therefore, summary judgment shall enter for Abbott on Nazarian's discrimination claim.

<u>Nazarian's Retaliation Claim</u>

Nazarian asserts that Abbott terminated his employment for filing a complaint against it with MCAD. To make out his claim for retaliation, Nazarian must establish: "(1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) a causal link existed between the protected activity and the adverse job action. In order to survive summary judgment, [plaintiff] 'must point to evidence in the record that would permit a rational factfinder to

---

[6] Nazarian repeatedly asserts that it was not until after he raised the specter of workplace discrimination that Abbott first started to give him negative performance reviews. However, looking at it from the other direction, one could reasonably infer that Nazarian first suggested that he was being discriminated against *after* it became increasingly clear that Abbott was not satisfied with his work.
[7] Nazarian suggests that he was treated differently from similarly situated individuals who performed worse than he did. However, there is simply no evidence in the record to establish that he was similarly situated to the one or perhaps two individuals to whom he refers. For example, there is no evidence as to such person(s) race or national origin, how long they worked at Abbott at the time, or how many times they had performed poorly (Nazarian had been criticized multiple times before finally being terminated). Furthermore, the only "evidence" as to this assertion is Nazarian's own statement that he is aware of such an individual(s). Because Nazarian has failed to develop any meaningful factual and/or legal argument on this issue, the Court will not address it any further.

conclude that the employment action was retaliatory.'" *Parra*, 605 F. Supp. 2d 334-35 (internal citations and citation to quoted case omitted).

Nazarian contends that Abbott did not provide any negative criticism about him until after he complained—that is, it was not until after he told Packard that he was pursuing a claim with the MCAD and/or he filed a complaint with the MCAD, that he received any negative criticism about his job performance. He claims that after his MCAD complaint, retaliatory actions by Abbott included, his first negative performance review (for 2008), his receiving written warnings, his being placed on a PIP, Packard cancelling a vacation, and, ultimately, after he amended his MCAD claim and it was dismissed, his termination. Abbott does not dispute that Nazarian has established that he suffered an adverse employment action. Rather, it argues that it is entitled to summary judgment on this claim because Nazarian cannot establish the requisite causal link. In the alternative, Abbott argues that it is entitled to summary judgment because Nazarian cannot establish that its legitimate reason for terminating him was pretextual.

Filing a complaint with the MCAD is protected activity within the meaning of Title VII. However, Nazarian fails to create a genuine issue of material fact as to whether the acts he complains of were taken against him in response to his discrimination complaint. As noted above, Nazarian's contention that his work performance was not criticized until he complained of workplace discrimination is overwhelmingly belied by the evidence. On the contrary the sequence of events show a continuum of increasingly measured, stronger action taken by Abbott as follows: 1) rating Nazarian AE on his 2005 and 2006 performance evaluations, but providing written criticism and downgrading his performance to PA in the areas where he continued to underperform, 2) placing him a CCP in 2007, 3) rating him AE on his 2007 evaluation, but noting areas he need to continue to improve, 4) disciplining him and/or issuing him warnings

concerning his negative interaction with colleagues, 5) rating him PA on his 2008 evaluation and noting several areas in which he continued to underperform, 6) placing him on a PIP in March 2009, 7) extending the PIP, 8) providing negative feedback regarding his performance under the PIP (on multiple occasions), and 9) termination. Nazarian also asserts that Packard cancelled his vacation in December 2008.

The actions taken in Steps 1-4 took place before Nazarian filed his complaint with the MCAD and therefore, do not support Nazarian's retaliation claim. Abbott took the actions in Steps 5-9 and cancelled Nazarian's vacation after he filed his complaint with the MCAD. The temporal "closeness" of Nazarian's complaints about workplace discrimination and Abbott's taking such actions against could suggest retaliation on Abbott's part. *See Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 50 (1st Cir. 2010)(when employment action falls hard on heels of protected activity, timing is often suggestive of retaliation). At the same time, Nazarian was not terminated until almost 11 months after he filed his MCAD complaint. While he *alleges* that the actions which culminated in his termination started almost immediately, I find that the undisputed evidence is that Abbott had problems with Nazarian's performance well before he filed his discrimination complaint. Furthermore, both before and after he filed the complaint, Abbott attempted to work with him to improve his workplace performance. When such attempts failed, Abbott terminated him. On this record, I find that as a matter of law, Nazarian has failed to establish that it did so in retaliation for his having engaged in protected activity under Title VII.

Even if I were to find that Nazarian had established a causal link and thus, satisfied his prima facie case, Abbott would still prevail. Abbott has established a legitimate reason for terminating Nazarian's employment. The burden would then shift to Nazarian to establish the

non-discriminatory reason was pretextual. *Sanchez-Rodriguez v. AT&T Mobility Puerto Rico, Inc.*, 673 F.3d 1, 13-14 (1st Cir. 2012). For substantially the reasons that I have found he could not establish pretext with respect to his discrimination claim, as buttressed by my findings concerning lack of causation with respect to this claim, I would find that he could not establish that Abbott's stated reason was pretextual.

The crux of this case is that Abbott takes the position that it terminated the Plaintiff's employment because his work performance was unsatisfactory. Plaintiff on the other hand, cannot fathom that his work performance was unsatisfactory and therefore, the only reason for his termination must be discrimination—or retaliation for his having complained of discrimination. Because the record overwhelming supports a Abbott's position that it fired Nazarian for poor work performance, and not for any discriminatory/retaliatory reason, I am granting summary judgment in its favor.

### *Nazarian's State Law Wrongrul Termination Claim*

Neither party has addressed the merits of Nazarian's state common law claim for wrongful termination. Presumably, they realize that this claim stands or falls based on the outcome of the Court's finding regarding the federal and state discrimination law claims. Since I have found that Abbott had a legitimate, non-discriminatory reason for terminating Nazarian's employment, it is also entitled to summary judgment on this claim.

### **Conclusion**

It is hereby Ordered that:

1. Defendant Abbott Laboratories' Motion for Summary Judgment (Docket No. 32), is ***allowed***; and

2. Defendant Abbott Laboratories' Motion To Strike Plaintiff's Evidence Offered In Opposition To Abbott's Motion For Summary Judgment (Docket No. 45) is ***allowed***, in part and ***denied***, in part.

Judgment shall enter for the Defendant.


**/s/ Timothy S. Hillman**
TIMOTHY S. HILLMAN
DISTRICT JUDGE